**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **RACHEL BENTLEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No.: 3:16-cv-01506-VLB** |
| **v.** | : | |
| | : | |
| | : | |
| **AUTOZONERS, LLC; and** | : | |
| **AUTOZONE NORTHEAST, LLC** | : | |
| | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Defendants move for summary judgment on the Plaintiff's, Rachel Bentley's, claims of gender discrimination, retaliation, and hostile work environment. Plaintiff, a former employee of AutoZoners, LLC ("AutoZone"), claims that, in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), she was terminated due to her gender and/or due to retaliation and that she was subjected to a hostile work environment by a co-worker. In connection with an investigation that was generated due to a report by another employee, Plaintiff admitted to telling a male employee that he needed to "get his d--- sucked." Plaintiff was terminated shortly after the company learned of this misconduct. Indeed, Plaintiff admits that her conduct was inappropriate and grounds for termination.

Based on the undisputed facts and the law, Plaintiff cannot survive summary judgment on any of these claims.   Specifically, Plaintiff cannot establish a *prima facie* claim for a discriminatory discharge because she has no circumstantial evidence that would permit a finding that her termination was due to her gender.   Plaintiff was replaced by a **female** employee and has no evidence that similarly situated individuals outside of her protected class committed the same misconduct and received more favorable treatment.   Even if she could establish her *prima facie* burden, she cannot establish that her termination was a pretext for intentional gender discrimination.   Similarly, she has no evidence that her termination was a pretext for intentional retaliation.   The decision maker terminated other individuals for the same misconduct, inappropriate comments, and had no knowledge of those individuals engaging in any protected activity.   Finally, with respect to her claim for a hostile work environment regarding alleged comments by a co-worker, Plaintiff cannot meet her *prima facie* burden because she cannot establish that: (1) the alleged conduct was objectively or subjectively abusive; and (2) that AutoZone knew or should have known of any gender harassment and failed to take prompt remedial action.

## A.     UNDISPUTED MATERIAL FACTS

AutoZone Northeast, LLC has no employees and, thus, was not the employer of Plaintiff or the regional managers involved in the decision to terminate her.  (*See* Rec. Doc. 23-1).

Plaintiff was hired by AutoZoners, LLC, on April 15, 2013, to work as a part-time sales employee at a store in Wallingford, Connecticut.  (Excerpts from

Plaintiff's Deposition ("Plaintiff Depo.") attached as Exhibit 1, p. 71)[1].  Plaintiff remained at the Wallingford Store until she was terminated in September of 2014.  (Plaintiff Depo., p. 71).

Upon hire, Plaintiff received a copy of an employee handbook.  (Plaintiff Depo., pp. 18-19).  Plaintiff acknowledged to the company, in writing, that she reviewed the handbook and agreed to comply with the policies and procedures set forth in the handbook.  (Plaintiff Depo., pp. 18-20; Exhibit 2 to Plaintiff Depo.).  Plaintiff admitted that she, in fact, read the handbook.  (Plaintiff Depo., pp. 18-19).

Plaintiff knew that AutoZone prohibited gender discrimination and harassment.  (Plaintiff Depo., p. 20; Exhibit 2 to Plaintiff Depo., pp. 11-15).  Employees are advised that if they experience any discrimination or harassment, they are "required to report it **immediately** to management, Human Resources, or AutoZone Relations. . . ."  (Plaintiff Depo., pp. 21-22; Exhibit 2 to Plaintiff Depo., p. 12).  Plaintiff knew that the company maintained a Problem Solving Procedure that employees could use to report any issues up through the chain of command.  (Plaintiff Depo., pp. 22-23).  This procedure encourages employees to report not only any workplace issues but also any dissatisfaction the employees might have with the manner in which their complaints were addressed or not addressed.  (Exhibit 2 to Plaintiff Depo., p. 17).

---

[1] All exhibits referenced herein are attached to Defendants' Motion for Summary Judgment.

Plaintiff was also informed that employees could be terminated for "acts or conduct which may be detrimental to an AutoZoner" and/or for "abusive language." (Exhibit 2 to Plaintiff Depo., p. 41). Plaintiff testified that she understood that she was not allowed to use any profanity or make any sexual comments in the workplace. (Plaintiff Depo., p. 26).

Finally, Plaintiff was also advised that employees were expected to report for work on time and work all scheduled hours. (Plaintiff Depo., pp. 86-87; Exhibit 2 to Plaintiff Depo., p. 22). She was further informed that AutoZone used an occurrence or "point" system to track attendance issues and that employees who accumulated 12 or more points would be terminated. (Plaintiff Depo., pp. 86-87; Exhibit 2 to Plaintiff Depo., pp. 22-28, 41). Plaintiff admitted that attendance points were posted daily such that she could know exactly how many points she had at all times. (Plaintiff Depo., pp. 86-87).

Plaintiff knew that she had numerous problems complying with the company's attendance policy and, accordingly, that she received written discipline due to her non-compliance. (Plaintiff Depo., pp. 86-87, 92). In fact, Plaintiff's attendance issues began within weeks of being hired at AutoZone as she was: late on May 18, 2013; absent on June 29, 2013; late on September 3, 2013; absent on September 7, 2013; absent on September 24, 2013; and absent on October 1, 2013.

Plaintiff received formal written discipline after her absence in October of 2013, and was notified that she had already accumulated 9.5 points as of October 15, 2013. (Plaintiff Depo., pp. 92-93; Exhibit 11 to Plaintiff Depo.).

Through this written discipline, Plaintiff was advised that if her attendance did not improve, she would be subject to "further corrective action . . . up to and including termination." (Exhibit 11 to Plaintiff Depo.).

Despite this warning, Plaintiff was late again in December of 2013, and was, accordingly, issued a "serious violation" corrective action due to her continued attendance problems. (Plaintiff Depo., p. 94; Exhibit 13 to Plaintiff Depo.). Once again, Plaintiff was advised that further attendance issues could lead to termination of her employment. (Exhibit 13 to Plaintiff Depo.). Plaintiff had earned 10 points by this time in December of 2013. (*Id.*)

Manuel Valentin came to work at the Wallingford Store as a Parts Sales Manager ("PSM") on January 28, 2014. (Declaration of Nuno Antunes ("Antunes Decl."), attached as Exhibit 2, Para. 6). Mr. Valentin was one of two PSMs, and the other was a female named, Justine Case. (Excerpts from Deposition of David Campanile ("Campanile Depo."), attached as Exhibit 3, p. 11). In January of 2014, the Wallingford Store did not have a Store Manager to whom the PSMs would normally report. (Campanile Depo., pp. 7, 9-11). Rather during this time while the company was trying to fill the Store Manager position, the District Manager, David Campanile, had responsibility for managing the store. (Campanile Depo., p. 11). Mr. Campanile personally visited the store. (Campanile Depo., p. 27). Mr. Campanile also had a Store Manager from another Store, Arif Mohamed, visit the store on a weekly basis for a few hours each time. (Campanile Depo., pp. 9-10). Mr. Campanile reported to the Regional Manager at the time, Charles Blank. (Campanile Depo., p. 6).

Neither Mr. Valentin nor Ms. Case had the authority to hire, fire, promote, demote, set compensation for, schedule hours for, or issue any written discipline to any employees.  (Campanile Depo., pp. 43-44).  Indeed, even a District Manager does not have the authority to decide to terminate any employees.  (*Id*.).  PSMs, such as Mr. Valentin and Ms. Case, could merely assign employees to work on a daily basis.  (Campanile Depo., p. 31).

Despite having been told in December of 2013 that she could be terminated if she was late to work again, Plaintiff was, in fact, late on January 17, 2014. (Exhibit A to Antunes Decl.).  In February of 2014, Plaintiff texted the Regional Human Resources Manager, Nuno Antunes, to complain that she could not get into the store because another employee had not shown up to open the store.  (Exhibit 5 to Plaintiff Depo.).  Plaintiff stated that she could "loose [sic] my job if I am late again."  (*Id*.).  Mr. Antunes responded by asking if she had called Mr. Campanile, and when Plaintiff said she had not, Mr. Antunes contacted Mr. Campanile for her.  (*Id*.).  Plaintiff testified that she would always call Mr. Antunes first about an issue and then follow it up with a text if she could not reach him and that she always communicated with him "**in that order**." (Plaintiff Depo., p. 11) (emphasis added).

Plaintiff had known and communicated with Mr. Antunes prior to her text to him in February of 2014.  In fact, in December of 2013, Mr. Antunes had interviewed and taken a written statement from her regarding a complaint he was investigating based on a report by a different employee that a male manager was yelling and getting in her face.  (Plaintiff Depo., pp. 14, 71-74).

Plaintiff knew that this male manager, Mr. Mestel, was subsequently fired for this policy violation.  (Plaintiff Depo., p. 74).

Plaintiff reported to work late, again, on March 7, 2014.  (Exhibit 7 to Plaintiff Depo.).  This most recent attendance policy violation meant that Plaintiff earned 13 points - - one point **more** than the number that could result in termination.  (Exhibit 7 to Plaintiff Depo.).  Despite the fact that, per the policy, Plaintiff could have been fired in March of 2014, Plaintiff was issued another "serious violation" corrective action.  (Plaintiff Depo., pp. 86-89; Exhibit 7 to Plaintiff Depo.).

On March 10, 2014, Plaintiff texted Mr. Antunes again to ask why she was hearing that she would be fired and to complain that Ms. Case "went around having people have a talk with me."  (Exhibit 5 to Plaintiff Depo.).  However, Plaintiff testified that she knew that she was in danger of being fired in March of 2014 due to her poor attendance.  (Plaintiff Depo., p. 99).

On May 21, 2014, Plaintiff texted Mr. Antunes again and stated: "Nuno I'm about to quit this job Manny [Valentin] is being so ridiculous and making up lies and trying to make me go home.  And he threatened to slap me."  (Exhibit 5 to Plaintiff Depo.).  That same day, Plaintiff also told Mr. Campanile, in person during one of his store visits, that Mr. Valentin said he was going to slap her because she was not performing her job.  (Campanile Depo., pp. 18-19, 22-23; Exhibit 1 to Campanile Depo.).  Plaintiff did not, at this point in May of 2014, or at any point in her employment, tell Mr. Campanile that Mr. Valentin had made any sexist or gender-based comment.  (Campanile Depo., pp. 23-24, 42-43).

Plaintiff admitted that, in addition to Mr. Valentin commenting on her poor performance, Ms. Case also told her that she was a "bad employee" and would not last long.  (Plaintiff Depo., p. 35).  Indeed, Plaintiff admitted that Ms. Case's complaints about Plaintiff's performance were the same as Mr. Valentin's. (Plaintiff Depo., p. 36).

On May 23, 2014, Mr. Antunes contacted Plaintiff, who reiterated that Mr. Valentin had said she was not doing her job, so he was going to send her home early and report her to Mr. Campanile for insubordination because she was refusing to do what he asked.  (Antunes Decl., Paras. 11-12).  Plaintiff admitted to Mr. Antunes that, in fact, she had not done what Mr. Valentin had asked her to do, but claimed she did not do so because she was busy with customers. (Antunes Decl., Para. 13).  Plaintiff also stated that the "slap" comment was made during a time in which she and Mr. Valentin were playing with one another and that she did not feel threatened or offended by this comment.  (Antunes Decl., Para. 14).  Plaintiff admitted that she did **not** consider Mr. Valentin's remark about slapping her to be gender-related.  (Plaintiff Depo., pp. 58-59).

On May 27, 2014, Mr. Antunes met with Mr. Valentin at Store 3228. (Antunes Decl., Para. 15).  Mr. Valentin admitted that he told Plaintiff he would send her home early because she was refusing to get parts for him and that he would be reporting her to the District Manager.  (Antunes Decl., Para. 16).  Mr. Valentin denied that he threatened to slap Plaintiff.  (Antunes Decl., Para. 17).

By June of 2014, the Wallingford Store had a Store Manager, Jonathan Granoff.  (Antunes Decl., Para. 18).  Plaintiff's attendance problems continued,

and on June 27, 2014, she reported to work nearly 45 minutes late.  (Antunes Decl., Para. 19; Exhibit A to Antunes Decl.).  Again, although she could have been terminated because she had exceeded the maximum 12 points of occurrence violations, Plaintiff was given a "Serious Violation" corrective action.  (Antunes Decl., Para. 19; Exhibit B to Antunes Decl.).

On July 12 of 2014, Plaintiff texted Mr. Antunes again to report that she could not clock in to work because the store was not open.  (Exhibit 5 to Plaintiff Depo.).  Plaintiff reported to Mr. Nunes that Mr. Granoff had not arrived at the store yet and she did not "want this to count against me."  (*Id.*).  Mr. Antunes responded by telling Plaintiff that he would advise Mr. Campanile about this.  (*Id.*).

On July 25, 2014, Mr. Campanile contacted Mr. Antunes to advise him that Ms. Case had stated that Mr. Valentin and Plaintiff were not getting along.  (Antunes Decl., Para. 21).  Mr. Antunes contacted Ms. Case on August 5, 2014, who stated that Mr. Valentin made comments to Plaintiff that Plaintiff was lazy, that he made fun of women, and that he stated that men are better than women.  (Antunes Decl., Para. 22).

On August 14, 2014, within approximately one week after speaking to Ms. Case, Mr. Antunes went to the Wallingford Store to speak with Plaintiff.  (Plaintiff Depo., pp. 13-14; Exhibit 1 to Plaintiff Depo.).  Plaintiff testified that she knew Mr. Antunes was speaking to her due to a matter brought to his attention by Ms. Case.  (Plaintiff Depo., pp. 13-14).  Plaintiff provided a written statement to Mr. Antunes.  Plaintiff testified that when she makes a statement in writing, she is

**honest**.  (Plaintiff Depo., p. 12).   Plaintiff further testified that she knew it was important to be truthful with Mr. Antunes when she met with him in August of 2014 and that **she gave him honest answers to all of his questions**.   (Plaintiff Depo., pp. 13-14).   Plaintiff further admitted that she was given the opportunity to review all of her answers before signing the statement.   (Plaintiff Depo., pp. 13-14).   Indeed, Plaintiff admitted she had the opportunity to go through her statement **page by page** and review all questions and answers before signing each page.  (Plaintiff Depo., pp. 47-48).   Plaintiff admitted that she was able to provide any and all information that she thought was relevant, was asked whether she wanted to add anything, and indicated she did not.  (Plaintiff Depo., pp. 47-48).   Plaintiff also admitted that Mr. Antunes asked whether her statement was the complete truth, and that she told him **it was**.  (Plaintiff Depo., pp. 16, 48-49).   She further admitted she never asked Mr. Antunes to clarify any question that he asked.  (Plaintiff Depo., p. 16).

In this August 2014 statement to the company, Plaintiff alleged that Mr. Valentin made sexist comments about women to male customers, made similar comments to her and Ms. Case about 15 to 20 times, and that the comments had stopped in July of 2014.  (Exhibit 1 to Plaintiff Depo.).  When Mr. Antunes asked Plaintiff: "Did you report these comments," Plaintiff answered "**No.**"  (*Id.*) (emphasis added).  That same day, August 14, 2014, Mr. Antunes instructed Mr. Campanile to try to avoid scheduling Mr. Valentin and Plaintiff to work at the same time so that they would not have to work together during the pendency of his investigation.  (Antunes Decl., Para. 23).

Because Plaintiff identified another manager, Joseph Perazella, as a witness to the allegedly sexist comments by Mr. Valentin (Exhibit 1 to Plaintiff Depo.), Mr. Antunes conducted an interview of him.  (Antunes Decl., Paras. 24-25).  Mr. Perazella stated that he never heard Mr. Valentin make inappropriate comments to or about women.  (Antunes Decl., Para. 26; Statement of Joseph Perazella, attached as Exhibit C to Antunes Decl.).

Mr. Antunes also spoke with another person Plaintiff identified as a "witness," Joseph Raynor, who also stated that he never heard Mr. Valentin make any degrading comments about women.  (Antunes Decl., Paras. 24, 27; Statement of Joseph Raynor, attached as Exhibit D to Antunes Decl.).

Mr. Antunes then spoke to Mr. Valentin, who denied making any degrading remarks about women and denied threatening to slap Plaintiff.  (Antunes Decl., Paras. 30-31; Statement of Manuel Valentin, attached as Exhibit E to Antunes Decl.).  Mr. Valentin reported inappropriate conduct by Plaintiff, specifically, that Plaintiff had said to him a few months ago, "Manny you need to get your d---sucked."  (*Id.*).

On September 10, 2014, based on Mr. Valentin's allegation towards Plaintiff, Mr. Antunes then went back to speak with Plaintiff.  (Antunes Decl., Para. 32).  In her September 10, 2014 written statement to the company, Plaintiff **admitted** to making this inappropriate, profane, statement to Mr. Valentin and claimed she said it in February of 2014.  (Antunes Decl., Paras. 32-33; Statement of Plaintiff, attached as Exhibit F to Antunes Decl.).

During the August interview with Mr. Antunes and her statement to the company, Plaintiff had also made allegations against Ms. Case - - that Ms. Case was eating candy and not paying for it, putting the store phones on hold so she did not have to answer them, and watching movies while she was supposed to be working.  (Exhibit 1 to Plaintiff Depo.).

Mr. Antunes spoke with Ms. Case and obtained a written statement from her.  (Antunes Decl., Paras. 34-36; Statement of Justine Case, attached as Exhibit G to Antunes Decl.).  Ms. Case stated that she heard Mr. Valentin make remarks about women not wanting to do anything; about Plaintiff being lazy; threatening to fire Plaintiff; and threatening to slap Plaintiff.  (Exhibit G to Antunes Decl.).  When questioned about the conduct that Plaintiff had reported, Ms. Case admitted to eating candy, cookies, chips and soda without paying for them; giving other employees chips and soda without paying for them; and placing the telephones on "hold" after the Store Manager left so she did not have to answer them.  (*Id.*; Antunes Decl., Paras. 37-38).

After completing his investigation, Mr. Antunes made the following recommendations to Mr. Blank: (1) terminate Plaintiff for improper language; (2) terminate Mr. Valentin for improper language; and (3) terminate Ms. Case for unauthorized consumption of merchandise.   (Antunes Decl., Para. 39). Plaintiff's gender and her complaint about Mr. Valentin's comments played no role in Mr. Antunes's recommendations.  (Antunes Decl., Para. 42).

Based on Mr. Antunes's recommendations and his knowledge of his practices, Mr. Blank decided to terminate all three individuals.  (Declaration of

Charles Blank ("Blank Decl."), attached as Exhibit 4, Paras. 4, 6). Mr. Blank had decided to terminate other male employees, including but not limited to Stuart Mestel and Jonathan Granoff, for committing conduct similar to that of Plaintiff and Mr. Valentin - - inappropriate comments and/or conduct. (Blank Decl., Paras. 5, 7). Mr. Antunes had recommended that these individuals be terminated. (Antunes Decl., Para. 40; Blank Decl., Para. 5). Neither Mr. Antunes nor Mr. Blank had any knowledge of any complaints of harassment or discrimination by Mr. Mestel or Mr. Granoff. (Antunes Decl., Para. 41; Blank Decl., Para. 8). Plaintiff's gender and alleged complaint of discrimination played no role in Mr. Blank's decision to terminate her employment (Blank Decl., Para. 9).

Once he received Mr. Blank's decision, Mr. Antunes contacted Mr. Campanile to ask him to carry out the terminations of Plaintiff, Mr. Valentin, and Ms. Case and provided Mr. Campanile with the verbiage to include in the termination forms. (Antunes Decl., Para. 43). All three individuals, Plaintiff, Mr. Valentin, and Ms. Case, were terminated on September 17, 2014. (Antunes Decl., Para. 44).

Plaintiff admitted that it was inappropriate to tell a man that "you need to get your d--- sucked." (Plaintiff Depo., p. 26). Plaintiff admitted that she considers the word "d---" to be profanity and that using that word would be grounds for termination. (Plaintiff Depo., pp. 77-78).

Plaintiff testified that throughout her employment, she was always a good employee, liked her job, was able to perform her job every day except one day

when a radiator fell on her head, and that she provided exceptional customer service.  (Plaintiff Depo., p. 71).  Plaintiff was replaced by a female employee. (Antunes Decl., Para. 45).

On October 6, 2014, Plaintiff provided a statement to unemployment in which she certified that she had been read her statement at the hearing and it was "true and correct."  (Exhibit 15 to Plaintiff Depo.).  Plaintiff stated that she had been disciplined for attendance.  (*Id.*).  She also stated that during her interview with Mr. Antunes on August 14, 2014, she reported that another manager was stealing.  (*Id.*).  Plaintiff did **not** allege that she had reported any sexist comments to Mr. Antunes before meeting with him in August of 2014.  (*Id.*; Plaintiff Depo., pp. 17-18).

On February 19, 2015, Plaintiff filed a sworn Affidavit with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the EEOC. (Plaintiff Depo., pp. 29-30; Exhibit 3 to Plaintiff Depo.).  Plaintiff admitted that she knew this Affidavit was submitted under penalty of perjury and that she needed to provide truthful information.  (Plaintiff Depo., pp. 28-29; Exhibit 3 to Plaintiff Depo.).  She testified that she **did** provide truthful information and that she reviewed this affidavit before she submitted it to the CCHRO to ensure it was honest and accurate.  (*Id.*; *See* also Plaintiff Depo., pp. 32-33).  Plaintiff alleged in her sworn Affidavit that the **only** report she made to any manager was in March of 2014, and that this report was made to Mr. Antunes, Mr. Campanile, and an unnamed "Store Manager" regarding the alleged threat to slap her by Mr. Valentin.  (Exhibit 3 to Plaintiff Depo., Paras. 20-21).  Plaintiff stated in this

Affidavit, under oath, that the first time she reported any "sexist comments" was to Mr. Antunes in September 2014, when he asked her whether she had any work complaints.  (Exhibit 3 to Plaintiff Depo., Paras. 23-24).

In her Complaint filed in this litigation, Plaintiff made identical allegations to those she made with the CCHRO.  (Rec. Doc. 1, Paras. 23-27).  Plaintiff testified that she reviewed the allegations in her lawsuit before it was filed to ensure it was accurate.  (Plaintiff Depo., p. 8).

On August 17, 2017, years after she advised the company, the CCHRO, and unemployment that she never reported any sexist comments to anyone before speaking to Mr. Antunes in the fall of 2014, Plaintiff testified at her deposition that she reported these comments to Mr. Antunes multiple times between January and May of 2014, and that he did not do anything in response to her complaints.  (Plaintiff Depo., pp. 10-11).

During her deposition, Plaintiff testified that she texted Mr. Antunes five times: once in January, twice in February, and once in March and April, regarding the sexist comments by Mr. Valentin.  (Plaintiff Depo., pp. 40-44, 46).  As noted above, she testified that she would first call Mr. Nunes and then follow it up with a text regarding any concern she had.  (Plaintiff Depo., p. 11).  She also testified that, contrary to her written statement to the company that she never reported any sexist comments until sitting down with Mr. Antunes in the fall of 2014, that she reported the alleged sexist comments to Mr. Campanile. (Plaintiff Depo., p. 23).

Then, after being confronted with the **actual** text messages detailed above, confirming that those were the **only** messages she sent Mr. Antunes, and realizing that her sworn testimony was contrary to the actual, contemporaneously documented evidence (which proved that she **never** texted him about any alleged sexual comments), Plaintiff stated she wanted to "retract" her statement about texting Mr. Antunes regarding the sexist comments. (Plaintiff Depo., pp. 56-57, 62).   Indeed, Plaintiff admitted that she had to **disavow all of her sworn testimony** that she gave regarding the alleged multiple texts to Mr. Antunes about sexual/gender comments:

> Q:   **Are you going to stand by the testimony that you gave me under oath five minutes ago**?
>
> A:   **No**.
>
> Q:   You're not. So you're going to retract all that testimony and we're going to start over again?
>
> A:   Yes.

(Plaintiff Depo., p. 60) (emphasis added).

Indeed, Plaintiff admitted to outright **lying under oath** during her deposition:

> Q:   Okay. So now we know when you told me earlier that you were texting him all these complaints **you were not telling the truth**?
>
> A:   **Okay**. I called him.

(Plaintiff Depo., p. 62. (emphasis added).   Even with her "changed," testimony, Plaintiff testified she never complained to anyone about Mr. Valentin after May of 2014.  (Plaintiff Depo., p. 70).

When asked why her deposition testimony regarding her allegedly repeated reports to Mr. Nunes about the sexist comments throughout 2014 was completely contrary to: (1) the written statement she gave the company; (2) her sworn testimony to unemployment; and (3) her sworn affidavit to the CCHRO and this lawsuit, Plaintiff offered no reason why her deposition story differed from all of these written statements she had made - - the statements that she testified were honest and correct and that she had reviewed before submitting.  Rather, Plaintiff's only "excuse" was her claim that she did not understand Mr. Antunes's questions and did not understand the questions at the unemployment hearing. (Plaintiff Depo., pp. 14-18, 24-25).   Plaintiff did not say that she failed to understand anything she, herself stated in her allegations in her Complaint in this litigation or in her Affidavit to the CCHRO.  (*Id.*)

Plaintiff claims that Mr. Campanile and Mr. Antunes engaged in retaliation by firing her.  (Plaintiff Depo., pp. 75-77).  Plaintiff admitted that even with her "changed" testimony, she is alleging that she complained to Mr. Antunes in February of 2014 and to Mr. Campanile in March of 2014, and admitting that she was not fired until September of 2014 - - after she admitted to making the comment about Mr. Valentin's "d---."  (Plaintiff Depo., pp. 75-77).

**B.    LAW AND ARGUMENT**

**1.    Summary Judgment Standard**

Summary judgment is warranted if the moving party shows that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R.Civ.Pro. 56(a). As this Court has recognized, "'[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses,' and it should be interpreted so as to accomplish this purpose." *John v. Bridgeport Board of Education*, 2011 WL 1106708, *9 (D. Conn. Mar. 22, 2011) (J. Bryant), *citing*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Furthermore, "[s]ummary judgment is appropriate if, after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *John*, 2011 WL 1106708, *9, *citing, Celotex Corp.*, 477 U.S. at 323. Finally, "'[i]f the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.'" *Id.*, *citing*, *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

**2.    All of Plaintiff's Claims Against AutoZone Northeast, LLC**

As discussed above, AutoZone Northeast, LLC did not employ Plaintiff, Mr. Valentin, Mr. Antunes or Mr. Blank.  Indeed, that entity has no employees. Accordingly, it is not an employer under the CFEPA.  Thus, Plaintiffs' claims

against AutoZone Northeast, LLC should be dismissed, with prejudice, at her cost.

### 3. Plaintiff's Gender Discrimination Claim

Claims under the CFEPA are analyzed the same as Title VII cases and governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *John*, 2011 WL 1106708, *9, *accord*, *Craine v. Trinity College*, 259 Conn. 625, 637, n. 6 (2002).

To establish a *prima facie* claim of a discriminatory discharge, Plaintiff must show that:(1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) either the position remained open or she was replaced by someone outside of her protected class and/or that the circumstances surrounding the employment action give rise to an inference of discrimination. *John*, 2011 WL 1106708, *13, *citing*, *De la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir. 1996); *Mills v. Southern Connecticut State University*, 2011 WL 3490027, *6 (D. Conn. 2011) (J. Bryant), *accord*, *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000). As this Court stated earlier this year:

> Evidence giving rise to an inference of discrimination includes . . . the more favorable treatment of similarly situated employees not in the protected group. *See Chambers*, 43 F.3d at 37; *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ('A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group.'). 'An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and

> discipline standards and (2) engaged in comparable conduct.' *Ruiz*, 609 F.3d at 493-94. Employees do not need to be the exact same rank to be 'similarly situated.' *Gorzynski*, 596 F.3d at 109 n. 7. . . .

*Robertson v. Wells Fargo Bank, N.A.*, 2017 WL 326317, *9 (D. Conn. Jan. 23, 2017) (J. Bryant).

If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Mills*, 2011 WL 3490027, *6.  "This burden is one of production, not persuasion; it can involve no credibility assessment." *Id.*, *citing*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

If the defendant articulates a legitimate, nondiscriminatory reason for its action, then the "burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for illegal employment discrimination." *Id.*, *accord*, *McDonnell*, 411 U.S. at 804.  An employer's reason for discharging an employee "'cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'"  *Asante-Addae v. Sodexo, Inc.*, 2015 WL 1471927, *16 (D. Conn. Mar. 31, 2015) (J. Bryant), *citing Donovan v. Yale Univ.*, 2014 WL 701511, *10 (D. Conn. Feb. 24, 2014) (emphasis in original). Importantly, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves*, 530 U.S. at 143 (citation and quotations omitted).

Plaintiff cannot establish her *prima facie* claim of gender discrimination because she cannot establish the fourth element of this claim.  First, she was not replaced by anyone outside of her protected class.  Rather, she was replaced by another **woman**.  This fact "undermines a finding that the circumstances surrounding the . . . terminat[ion] gave rise to an inference of gender discrimination."  *Aiello v. Stamford Hosp.*, 2011 WL 3439459, *16 (D. Conn. Aug. 8, 2011) (J. Bryant).   Moreover, she cannot establish any inference of discrimination because Plaintiff cannot establish that any similarly situated individual outside of her protected class committed the same misconduct, but received more favorable treatment.  To be similarly situated, the decision maker must have knowledge that other individuals had engaged in similar misconduct.  *Aiello,* 2011 WL 3439459, *16

It is undisputed that: (1) Mr. Antunes made the recommendation and Mr. Blank decided to discharge Mr. Valentin and two other male individuals, Mr. Granoff and Mr. Mestel, for the same misconduct as Plaintiff; and (2) Mr. Antunes and Mr. Blank are unaware of anyone who committed the same misconduct whom he allowed to remain employed.  Thus, given these undisputed facts, Plaintiff has no evidence to raise any inference of discriminatory treatment.  *Asante-Addae,* 2015 WL 1471927, *16 (employee's failure to identify any similarly situated individuals who received more favorable treatment resulted in her inability to establish her *prima facie* case of gender discrimination); *Robertson,* 2017 WL 326317, *10 (employee failed to establish her *prima facie* discriminatory discharge claim given that: (1) there was no evidence that

similarly situated individuals outside of her protected class received more favorable treatment, and (2) there was evidence that the company terminated employees who were also found to have violated the policies (irrespective of their protected class status)).

Moreover, even had Plaintiff met her *prima facie* burden (which she did not), she cannot show that AutoZone's articulated, legitimate, nondiscriminatory reason for her termination (her admittedly inappropriate and profane comment), was a pretext for intentional discrimination.   It is undisputed that Plaintiff admitted to committing the misconduct for which she was fired and agreed that her misconduct constituted a legitimate basis for termination.   Moreover, Plaintiff does not accuse either the person recommending that she be fired, Mr. Antunes, or the decision maker, Mr. Blank, of any alleged gender discrimination. To the contrary, Plaintiff admitted that she knew she could have been fired for violating the attendance policy back in March of 2014 – five months before she was actually terminated.  She also could have been fired in June of 2014, when she continued to violate the company's attendance policy.  She was not.  Thus, despite her repeated admitted violations of the attendance policy, Plaintiff was not terminated in March or June of 2014, but rather was given multiple opportunities to comply with company policies and to remain employed.  Plaintiff was only fired after it was discovered and she **admitted** that she used profane language in the workplace.   If anything, Plaintiff received more favorable treatment than Mr. Valentin given that Mr. Valentin denied committing any offensive behavior.   He was still discharged based on the statements of Ms.

Case and Plaintiff.  In contrast, Plaintiff **admitted** to making the statement of which she was accused and admitted that she knew it violated company policy and constituted grounds for termination.  Accordingly, Plaintiff was treated either the same as or better than men terminated for engaging the same misconduct as she.

All Plaintiff offers as "evidence" in support of her discriminatory discharge claim is her speculation that she was discharged due to her gender.  Plaintiff's alleged belief that she was fired due to her gender is simply insufficient to establish pretext and to defeat summary judgment on this claim. *John*, 2011 WL 1106708, *13 (employee's contention that she was not hired due to her gender was "entirely subjective and speculative and cannot give rise to liability under . . .the CFEPA. . ."), *accord*, *Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 469 (W.D. N.Y. 2005) ("It is well settled that for a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more than present conclusory allegations of discrimination . . . he or she must offer concrete particulars to substantiate the claim"); *Robertson*, 2017 WL 326317, *11 (employee failed to demonstrate that her termination for a violation of the Code of Ethics constituted pretext as her mere speculation was insufficient to defeat summary judgment).  Because Plaintiff cannot create a genuine issue of material fact regarding whether her termination was a pretext for intentional gender discrimination, this claim should be dismissed.

### 4.      Plaintiff's Retaliatory Discharge Claim

This claim, too, is analyzed under the *McDonnell Douglas* framework. *John*, 2011 WL 1106708, *17.   Moreover, "Connecticut courts look to federal case law for guidance in interpreting this [retaliation] provision of the CFEPA." *Id.*, *accord*, *State v. Commission on Human Rights and Opportunities*, 211 Conn. 464, 470 (1989).   To establish a *prima facie* case of retaliation under the CFEPA, Plaintiff must show: (1) that she engaged in protected activity; (2) that the decision maker was aware of that activity; (3) that she suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and adverse employment action.   *John*, 2011 WL 1106708, *17, *accord, Manoharan v. Columbia Univ. Coll. of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

With respect to the fourth element, the causal connection, "the temporal proximity between an employer's knowledge of protected activity and the adverse employment action must be 'very close.'"  *John*, 2011 WL 1106708, * 18, *citing*, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).   As observed by this Court, "[t]he Second Circuit has held that even a three-month gap between the protected activity and the adverse employment action may negate an inference of retaliation."   *John*, 2011 WL 1106708, *18, *accord*, *O'Reilly v. Consolidated Edison Co. of New York, Inc.*, 173 Fed. Appx. 20, 22 (2d Cir. 2006).

In this matter, Plaintiff cannot establish her *prima facie* retaliation claim because she cannot establish any causal connection between her alleged report

of discrimination/harassment and her termination in September of 2014. By Plaintiff's own testimony, she allegedly reported the sexist comments as early as January or February of 2014. She was not terminated until September of 2014. This eight to nine month gap in time between the two events **negates** any inference of a causal connection. *John*, 2011 WL 1106708, *19 (three-month gap between protected activity and adverse employment action "does not suffice to establish a causal nexus."). *See also*, See, e.g., *Cunningham v. Consolidated Edison Inc.*, No. CV–03–3522(CPS), 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (holding that a passage of two months between protected activity and adverse employment action attenuated causal relationship); *Hussein v. Hotel Employees & Restaurant Union, Local 6*, 108 F.Supp.2d 360, 367 (S.D.N.Y. 2000) ("the passage of more than two months defeats any retaliatory nexus").

Moreover, as discussed above, AutoZone has articulated a legitimate, nondiscriminatory, non-retaliatory reason for deciding to discharge Plaintiff – her admitted use of profane language. Plaintiff has no evidence that this is a pretext for intentional retaliation. While Plaintiff's testimony that she made complaints for months before she was terminated is not credible, it would defeat her claim for retaliation as she admitted she was not fired until the company learned of her profane language - - months later. Regardless, even considering Plaintiff's report in August of 2014, she has no evidence to suggest the company's reason for terminating her was false. To the contrary, she admitted she knew she could be fired for using profanity. And, again, she has no evidence that similarly situated individuals who committed the same misconduct

received more favorable treatment than she.  There is no evidence that the other individuals fired for committing the same misconduct, Mr. Mestel and Mr. Granoff, engaged in any protected activity, let alone that Mr. Blank knew of any such protected activity.  Thus, Plaintiff has failed to create a genuine issue of material fact regarding whether her termination was due to her alleged complaint of harassment.  *Mills,* 2011 WL 3490027, *15 (employee failed to provide circumstantial evidence of a retaliatory animus given the lack of evidence of disparate treatment of employees who engaged in similar conduct).

### 5.  Plaintiff's Hostile Work Environment Claim

To establish her hostile work environment claim[2], Plaintiff must demonstrate that:

> (1) she 'subjectively perceive[d] the environment to be abusive;' (2) the conduct was so 'severe or pervasive' that it created an 'objectively hostile or abusive work environment', meaning 'an environment that a reasonable person would find hostile or abusive;' and (3) the conduct created an environment abusive to employees 'because of their race, gender, religion or national origin.' *Harris,* 510 U.S. at 21–22.

> The Supreme Court has established a non-exhaustive list of factors relevant to determining whether a workplace is so severely or pervasively hostile as to support a Title VII claim. These include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether the conduct unreasonably interfered with plaintiff's work; … whether it unreasonably interferes with the employee's work

---

[2] This CFEPA claim, too, is analyzed the same as a hostile work environment claim brought under Title VII.  *Mills*, 2011 WL 3490027, *16.

performance[;]' and '[t]he effect on the employee's psychological well-being[.]' *Id*. at 23.

* * *

Furthermore, the alleged hostility must be generated on the basis of a protected characteristic. As the Second Circuit has noted, federal law 'does not guarantee a utopian workplace, or even a pleasant one. Indeed, Title VII is not a civility code.' *McGallum v. Cedar Graphic, Inc.*, 609 F.3d 70 (2d Cir.2010). Personality conflicts between employees are not the business of the federal courts. *Vore v. Indiana Bell Telephone Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir.1994). The fact that a supervisor is rude, disrespectful, yells at or criticizes an employee will not support a hostile work environment claim in the absence of any connection to a protected characteristic. *See Breeding v. Arthur J. Gallagher and C*o., 164 F.3d 1151, 1159 (8th Cir.1999).

*Mills*, 2011 WL 3499027, * 11-12,

Plaintiff cannot meet her burden to establish that her work environment was objectively and/or subjectively abusive.

Plaintiff's allegations are limited to the following alleged comments by her co-worker, Mr. Valentin: (1) he stated to customers "f------" women; never work with a female, females are lazy, they don't do anything" on approximately 20 occasions between the seven-month period of January through July of 2014; (2) he told Plaintiff and Ms. Case that they were "lazy," that he did not like working with women, and that he thought men were superior to women on approximately 15 occasions during the same time period.[3] (Exhibit 1 to Plaintiff. Depo.)

---

[3] Plaintiff admitted she is **not** claiming that Mr. Valentin's allege "threat" to slap her had anything to do with her gender. In any event, it is undisputed that Mr. Antunes promptly investigated this incident by speaking with both Plaintiff and Mr. Valentin.

Thus, at worst, Plaintiff heard or overheard 35 of these alleged comments over the course of approximately 183 days - - or one comment every 5.2 days. First, Mr. Valentine's remarks calling Plaintiff and/or Ms. Case "lazy" have nothing to do with gender.  Therefore, they cannot be considered part of Plaintiff's hostile work environment claim.   *Mills*, 2011 WL 3499027, *13 (expressing general frustration is not gender-based conduct).

Second, the other alleged comments were both infrequent, not severe, and not physically threatening.  Moreover, the alleged comments certainly did not interfere, let alone, unreasonably interfere with Plaintiff's work performance given her testimony that she was always able to perform her job and that she liked her job.  Accordingly, Plaintiff cannot establish that the alleged conduct objectively or subjectively interfered with her work performance.  *John*, 2011 WL 1106708, *16 (employee failed to establish the requisite severity or pervasiveness of conduct necessary to maintain a hostile work environment claim), *accord*, *Nieves v. District Council 37, AFSCME*, No. 04–CV–8181(RJS), 2009 WL 4281454, at *1–3 (S.D.N.Y. Nov. 24, 2009) "(holding that plaintiff had failed as a matter of law to establish a hostile work environment claim where evidence showed that, over a roughly one-year period, her supervisor (a) constantly commented on her physical appearance; (b) sent her e-mails containing pornography; (c) inserted his fingers into a condom and then waved them in the area of the plaintiff; (d) blew kisses at her; (e) 'jokingly' asked her to take a nude picture of him; (f) instructed her to open a drawer he knew to be filled with condoms; and (g) made five comments about how plaintiff would stay

in the same room as a male colleague during a business trip); *Celestine v. Petroleos de Venezuela*, 266 F.3d 343, 354 (5th Cir. 2001) (holding that eight incidents of racial harassment over a twenty-five month period were not sufficiently severe or pervasive to create a hostile work environment)."

In addition to not being able to establish an actionable hostile work environment, Plaintiff cannot establish a basis for holding AutoZone liable for the alleged comments by Mr. Valentin.  Given that Mr. Valentin had no authority to take any tangible employment decision with regards to her employment (as he lacked authority to hire, fire, set work schedules and/or set compensation), Mr. Valentin is not a "supervisor" under the law.   *Borrero v. Collins Building Services, Inc.*, 2002 WL 31415511, *1 (S.D.N.Y. Oct. 25, 2002). Accordingly, in order to hold AutoZone liable, Plaintiff must prove that  that AutoZone knew or should have known of any alleged harassment by her co-worker and failed to take prompt, remedial action. *Borrero*, 2002 WL 31415511, *10, *accord Howley v. Town of Stratford*, 217 F.3d 141, 153-154 (2d Cir. 2000). *See also*, *Sarkis v. Ollie's Bargain Outlet*, 560 Fed. Appx. 27 (2d Cir. 2014).

Plaintiff admitted that she knew that the company had a policy for reporting harassment and that she was supposed to immediately do so. Through her written statement to the company in August of 2014, Plaintiff admitted that she never reported any alleged gender-remarks by Mr. Valentin until Mr. Antunes came to speak with her on August 14, 2014 regarding Ms. Case's allegations.  The contemporaneously made text messages Plaintiff sent Mr. Antunes between January and July of 2014 confirm that fact.  Moreover,

Plaintiff represented in sworn statements to the CCHRO and unemployment that she never reported the alleged "sexist" comments until this meeting with Mr. Antunes in late 2014.   The same day Mr. Antunes learned of the alleged comments, he separated Mr. Valentin and Plaintiff such that they would not be scheduled to work together during the pendency of his investigation.   Mr. Antunes conducted a thorough investigation by interviewing and obtaining statements from Plaintiff, all witnesses whom Plaintiff identified, and Mr. Valentin.   Within a month of Plaintiff's report to Mr. Antunes, Mr. Valentin was terminated.   Given these undisputed facts, Plaintiff cannot establish a basis for holding AutoZone liable.   *Borrero*, 2002 WL 31415511, *12-13 (employee could not establish a basis for holding the company policy given that the company had a procedure for reporting harassment, the employee did not report harassment per the procedure for months, and upon learning of the alleged harassment, the employer separated the alleged harasser from the employee);   *Sarkis*, 560 Fed. Appx. 27 (affirming summary judgment on employee's hostile work environment claim on the basis that it was undisputed that the company  had procedures in place to respond to complaints of harassment and the employee did not avail himself of those procedures);   *Summa v. Hofstra University*, 708 F.3d 115, 124 (2d Cir. 2013) (affirming summary judgment on plaintiff's hostile work environment claim because the undisputed facts revealed that the university took reasonably prompt, remedial action upon receiving reports of harassment).

AutoZone anticipates that, based on the new story that she came up with during her deposition, that she allegedly reported the alleged harassment to Mr.

Antunes approximately 20 times before August 14, 2014, Plaintiff will claim that she has created a genuine issue of fact that remains for trial concerning the company's knowledge of the harassment and actions taken in response. Plaintiff's deposition testimony, however, is insufficient to create a genuine issue of material fact on this issue.

It is well-settled that Plaintiff has the burden of demonstrating that a "fair minded jury could return a verdict for the plaintiff on the evidence presented." *Rojas v. the Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011), *accord*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  In *Rojas*, the Second Circuit held:

> Although a district court generally should not weigh evidence or assess the credibility of witnesses, we have held that in the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff . . . and thus whether there are genuine issues of material fact, without making some assessment of the plaintiff's account. . . . **in certain cases a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised genuine issues of material fact to be decided by a jury.**

*Rojas*, 660 F.3d at 105, 106 (quotations and citations omitted) (emphasis added).

In *Rojas*, which involved circumstances nearly identical to these, the Second Circuit found that such "rare circumstances" existed.  In that matter, as in this litigation, a central issue was whether the employer knew or should have

known of the alleged harassment and failed to act.  In *Rojas*, the Second Circuit noted that in her three federal complaints, one to the EEOC, and two to the District Court, the employee alleged that she made **generalized** complaints about a co-worker on October 30, 2006, October 31, 2006, and November 2, 2006 - - none of which contained any allegations that she complained specifically of sexual harassment.  Similarly, at a criminal trial, the employee testified that she had **not** made any such specific complaints during her employment.  But, the employee's "story changed when she was deposed" on April of 2009 in the civil litigation at issue, where "for the first time she stated that she had complained [about sexual harassment] during her annual performance evaluation on August 8, 2006."  *Id*. at 104.  The employee also submitted an affidavit in opposition to the defendant's motion for summary judgment in which she asserted she repeatedly reported sexual harassment and the defendant failed to act.  *Id.*

Both the District Court and the Second Circuit noted that while the employee "relied solely on her own testimony to support these assertions, the [employer] supported its motion for summary judgment with affidavits and contemporaneous e-mails and meetings notes strongly suggesting that it had no knowledge of the alleged harassment until after [the employee's] employment ended. " *Id.* at 103.

The Second Circuit observed that the District Court had "catalogued the inconsistencies and contradictions described above (among others) and concluded that 'this case goes far beyond simple issues of credibility.  Rather, upon the entire record, Plaintiff has changed key aspects of her prior version of

events, set forth in pleadings, trial testimony, and sworn discovery responses, in an attempt to defeat [the employer's] summary judgment motion.'" *Id*. at 103-04, *citing Rojas II*, 783 F. Supp.2d at 406-07.  Thus, the Second Circuit found that the District Court had properly concluded that the employee offered "sham evidence" in opposition to the motion for summary judgment and that "no reasonable juror could believe certain of [her] factual averments in opposition to summary judgment, given contradictory statements she had made in prior sworn testimony and pleadings." *Id*. at 104.

In upholding the District Court's decision to grant summary judgment, the Second Circuit held: "[the employee's] new allegations, directly contradicted by her prior sworn statements and judicial admissions, were properly rejected by the District Court after a careful consideration of the record before it."  *Id*. at 105, *accord Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming district court's entry of summary judgment where "(1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences  in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys's testimony" (internal citation and alteration omitted)); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528–29 (2d Cir.1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. Accordingly, the district court

properly disregarded Universal's affidavits seeking to controvert its own pleading." (internal citations omitted)).

Based on its determination that the District Court had properly ignored the employee's story told at her deposition regarding an alleged prior report of sexual harassment in light of the employee's inconsistent and contradictory statements, the Second Circuit found that the employee failed to raise any genuine issue of material fact to be decided by a jury regarding the lack of employer liability. *See also*, *Newsome and Proux v. IDB Capital Corporation and IDB Bank*, 2016 WL 1254393, *19-20 (S.D.N.Y. Mar. 28, 2016) (finding that no rational fact finder could credit employee's allegation that a co-worker called him "Mr. Big" with the intent of making a racially stereotypical remark because employee's allegations were contradictory and inconsistent in that: (1) the employee testified that there were only three instances when this comment was made: (2) the employee had also given sworn testimony that the comments occurred on a weekly basis; and (3) a letter from the employee's attorney set forth specific instances of alleged discrimination, but did not mention these alleged comments); *Leniart v. Murphy*, 2016 WL 1273166, *6, fn. 7 (D. Conn. Mar. 31, 2016) (adopting the defendant's version of an incident because the plaintiff's version of events was "blatantly contradicted by the documentary evidence" and stating that: "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of a ruling on a motion for summary judgment.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007).").

As in *Rojas*, AutoZone is presenting **contemporaneous** documents: the texts by Plaintiff to Mr. Antunes which reveal that she did **not** report any sexual harassment and Plaintiff's own statement to the company dated August 14, 2014 in which she represented to the company that she had **never** reported any sexist comments until that date.   AutoZone has also presented Plaintiff's sworn statements made to the CCHRO and to unemployment (which were made much closer in time to the events than her deposition testimony) that reveal that she failed to report any sexual harassment before meeting with Mr. Antunes in the fall of 2014.   AutoZone has also relied upon the allegations in Plaintiff's Complaint in this litigation, in which she stated that the only conduct she reported prior to this meeting was the alleged "slap" (which Plaintiff testified was not related to her hostile work environment claim based on her gender). Indeed, AutoZone submits that it has presented even more compelling evidence than the employer in *Rojas* - - Plaintiff's own admission that **she lied under oath in her deposition** given that: (1) she first testified she texted Mr. Antunes regarding the alleged harassment multiple times before meeting with him in August of 2014; and (2) then had to "retract" all of her testimony when impeached with the texts that proved she had lied about what she reported to Mr. Antunes prior to August of 2014.

Thus, as in *Rojas*, Plaintiff cannot create a genuine issue of material fact for trial on the issue of whether AutoZone did not know of any harassment until August 14, 2014 and, upon learning of her allegations, took prompt remedial action.

## C.    CONCLUSION

Based on the undisputed facts and the law, summary judgment in favor of

Defendants should be granted as to all of Plaintiff's claim; thus, all of Plaintiff's

claims should be dismissed with prejudice, at her cost.

Dated: September 19, 2017                 Respectfully submitted,


*/s/ Laurie M. Riley*
**Laurie M. Riley**
**Florida Bar Number: 657751**
**Local Civil Rule 83.1(d) Counsel**
**Jones Walker LLP**
**201 Biscayne Blvd., Suite 2600**
**Miami, Florida 33131-4341**
**Telephone: 305-679-5728**
**Facsimile: 305-679-5816**
**Email: lriley@joneswalker.com**

**AND**

**Tracy E. Kern**
**Louisiana Bar No.: 20246**
**Local Civil Rule 83.1(d) Counsel**
**Jones Walker LLP**
**201 St. Charles Avenue**
**New Orleans, LA  70170-5100**
**Telephone: 504-582-8134**
**Facsimile: 504-589-8134**
**Email:tkern@joneswalker.com**

**AND**

**Paula N. Anthony, Esq.**
**Federal Bar No. CT08972**
**Berchem, Moses & Devlin, P.C.**
**75 Broad Street, Milford, CT 06460**
**Telephone:  203-783-1200**
**Email:  panthony@bmdlaw.com**

**Counsel for Defendants AutoZoners, LLC and AutoZone Northeast, Inc.**

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury under the laws of the State of Connecticut that on September 19, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing via the CM/ECF filing system to counsel of record for Plaintiff at the email address described below:

**James V. Sabatini**
**CT 19899**
**Sabatini And Associates, LLC**
**One Market Square**
**Newington, Connecticut 06111**
**Phone: (860) 667-0839**
**Fax: (860) 667-0867**
**Email: jsabatini@sabatinilaw.com**

**DATED this 19th day of September, 2017.**

*/s/ Laurie M. Riley*
**Laurie M. Riley, Florida Bar Number: 657751**
**Admitted *Pro Hac Vice***
**Jones Walker LLP**
**201 Biscayne Blvd., Suite 2600**
**Miami, Florida 33131-4341**
**Telephone: 305-679-5728**
**Facsimile: 305-679-5816**
**Email: lriley@joneswalker.com**

{M1384120.1}

38