UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RACHEL BENTLEY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:16cv1506 (DJS) |
| | : | |
| AUTOZONERS, LLC and | : | |
| AUTOZONE NORTHEAST, LLC, | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION

The plaintiff, Rachel Bentley ("Bentley), brings this action against her former employer, AutoZoners, LLC[1] ("AutoZone"), claiming gender discrimination, hostile work environment, and retaliation in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60 ("CFEPA"). Bentley filed her action in the Connecticut Superior Court and AutoZone removed the matter to the United States District Court for the District of Connecticut on the basis of diversity of citizenship. Pending before the Court is AutoZone's motion for summary judgment. For the reasons stated below, AutoZone's motion is granted.

## I.  STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[1]Bentley's Complaint also names AutoZone Northeast, LLC as a defendant. The defendants argue and have provided evidence that AutoZone Northeast, LLC was never Bentley's employer and, in fact, has no employees. Bentley has not responded to that argument and thus concedes that point. *See Jackson v. Federal Express*, 766 F.3d 189, 198 (2d Cir. 2014) "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." Consequently, all claims against AutoZone Northeast, LLC are dismissed.

law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute."  *American  International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (internal quotation marks omitted).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Id.*

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent . . . .  Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted).  The nonmoving

party must "'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). "[T]he standard for determining whether the evidence [is] sufficient to sustain the submission of plaintiff's case to the jury [is] simply whether on the basis of that evidence, a factfinder could reasonably find the essential elements of a case of discrimination . . . . [E]mployers should not be held liable for discrimination in the absence of evidence supporting a reasonable finding of discrimination." *James v. New York Racing Association*, 233 F.3d 149, 154-55 (2d Cir. 2000).

## II.  "SHAM EVIDENCE"

Before reciting the facts it finds undisputed for purposes of this motion, the Court wishes to address the issue of "sham evidence" raised by the defendant. It is well-established that "a district court generally should not weigh evidence or assess the credibility of witnesses" when ruling on a motion for summary judgment. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). However, "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). "[W]hen evidence is so contradictory and fanciful that it cannot be believed by a reasonable person, it may be disregarded." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 476 (S.D.N.Y. 2003).

Bentley testified at her August 17, 2017 deposition that she had complained to AutoZone Human Resources Manager Nuno Antunes ("Antunes" or "Nuno") on more than twenty

occasions between January and May of 2014 about sexist comments made to her at work by a co-worker, Manuel Valentin ("Valentin"), who was in a position of authority over her. She testified further that she also complained to District Manager David Campanile ("Campanile") on multiple occasions about those comments and also complained on one occasion to another manager named Arif Mohamed, but that nothing was ever done in response to her complaints.

On August 14, 2014, Antunes met with Bentley in response to a report he received from another AutoZone employee, Justine Case ("Case"), that Valentin had made sexist comments to Bentley. During that meeting, Bentley signed a written statement in which she represented that Valentin had made sexist comments to male customers "[a]bout 20 times" and had made sexist comments to her and Case "[l]ike 15 times." (Doc. # 36-1, at 62). When asked the question, "Did you report these comments?" she responded, "No." (*Id.* at 63). Bentley also stated that in addition to Case, two other AutoZone employees, "Joe Reynor [and] Joe from commercial" witnessed Valentin making these comments. (*Id.*). She also represented that her statement was "the complete truth" and that there was not "anything else that [she] want[ed] to include in this statement." (*Id.* at 68). Each page of Bentley's written statement that contained her answers to questions posed by Antunes included the following advisement at the bottom of the page: "By signing this statement form, you acknowledge that the comments and statements made by you and contained herein are accurate, complete and were made by you in the course of this statement." (*Id.* at 62-69).

At her deposition, Bentley agreed she told Antunes in August 2014 that she had not reported Valentin's comments:

> Q.     You reported to AutoZone in August of 2014 when you sat down to give the statement to Nuno that you had never reported the comments, correct?

4

A.      Yes.

(*Id*. at 19, p. 24:10-13). When asked to explain the change between her August 2014 statement and her deposition testimony about reports to Antunes, Campanile, and Mohamed, Bentley stated that she wasn't changing her testimony, but had thought that Antunes' question in 2014 about reporting Valentin's comments meant reporting them to a store manager, as opposed to reporting them to Antunes or anyone else. According to Bentley, "I never reported anything to my store manager because we always had different ones. So instead of reporting to my store manager, I reported to Nuno." (*Id.* at 19-20, pp. 24:25, 25:1-3). The Court notes that in January 2014, which is when Bentley testified she first reported sexist comments to Antunes, the position of store manager in the store where Bentley worked was unfilled.

Bentley acknowledged at her deposition that she had received and reviewed the AutoZone employee handbook at the beginning of her employment and understood that AutoZone prohibited gender discrimination and harassment. She also testified she understood that if she believed she was being harassed she was to report the harassment to a manager or human resources, or she could call a 1-800 number. When asked why she failed to call the 1-800 number when Antunes took no action in response to the complaints she said she made to him, Bentley testified that she "didn't know about the 1-800 number." (*Id.* at 16, p. 21:20-23). When she was reminded that the 1-800 number was in the handbook, Bentley responded by stating that she "threw my handbook out two weeks after I was employed" and, in terms of her review of the handbook, she "also wasn't thorough with my reading. I skimmed." (*Id.* at 17, p. 22:1-2, 16-17).

After Bentley's AutoZone employment was terminated, she filed a claim for

unemployment benefits. At her deposition, Bentley agreed that she represented to the

unemployment commission that she had never reported Valentin's comments to AutoZone:

> Q.      Do you recall telling the Employment Commission that you never
> reported Mr. Valentin's alleged conduct to the employer? Do you recall
> that testimony?
> A.      Yes.

(*Id.* at 12, p. 17:8-12).

On February 19, 2015, Bentley filed a complaint against AutoZone with the Connecticut

Commission on Human Rights and Opportunities. In connection with that complaint, Bentley

submitted a sworn Complainant's Affidavit ("Affidavit"). In her Affidavit, Bentley stated that in

March 2014 Valentin threatened to slap her and that she "informed [AutoZone's] human

resources department, the store manager, and the district manager, David Campanile, that

Valentin threatened to slap her." (Doc. # 36-3, at 19, ¶¶ 19-21). Although that Affidavit also

alleged that Valentin had made sexist comments to her in 2014, it does not state that the sexist

comments were reported to anyone at AutoZone before September 2014. Bentley's Affidavit

goes on to state that in September 2014, Bentley "told Antunes that Valentin threatened to slap

her and repeatedly made sexist remarks to her." (*Id.* at 19, ¶¶ 23-24).

In her Complaint in this action, Bentley alleges that "Valentin made sexist comments in

the workplace approximately 20 times." (Doc. # 1, at 17, ¶ 30). She alleges that in March 2014

Valentin made sexist comments and then threatened to slap her. The Complaint also states that in

that same month she "informed Defendant's human resources department, the store manager, and

the district manager, David Campanile, that Valentin threatened to slap her."  (*Id.* at 16-17, ¶¶

21-24). With regard to the reporting of sexist comments made by Valentin, the Complaint alleges

6

only that when Antunes asked Bentley in September 2014 whether she had any work complaints, she "told Antunes that Valentin threatened to slap her and repeatedly made sexist remarks to her." (*Id.* at 17, ¶¶ 26-27).

At the beginning of her deposition, Bentley testified that "[w]hen the whole situation happened, I would report to him [Antunes] every time a comment was made, every time something was happening." (Doc. # 36-1, at 6, p. 11:1-3). When asked how many times she reported comments to Antunes, Bentley responded, "I lost count after 20." (*Id.* at 6, p. 11:13-15). After that response, the following exchange took place between defendant's counsel and Bentley:

> Q.      Were these reports that you made to Nuno made by phone . . . [or] via text?
> A.      It was by phone and via text.
> Q.      How many text messages did you send him allegedly reporting comments made by Mr. Valentin?
> A.      I lost count after ten times. Because I would call, I would text, I would call, I would text, in that order.

(*Id.* at 6, p. 11:16-23).

Bentley later testified that Valentin made a sexist comment to her in January 2014 and that she reported that comment to Antunes that day. When asked how she knew she reported it that day, Bentley responded, "Because I texted him while I was on the floor and I told him." (*Id.* at 30, p. 41:3-5). She subsequently testified that after Valentin threatened to slap her in March 2014, she sent a text message to Antunes reporting the threat and also sexist remarks Valentin had made.

After Bentley had testified about text messages she sent to Antunes between January and March of 2014, defendant's counsel showed her an exhibit containing a series of text messages

7

between Bentley and Antunes during the relevant time period and reviewed the messages she had

sent to Antunes over that period of time. None of the text messages mentioned any sexist

remarks made by Valentin. (Doc. # 36-3, at 22-25). After reviewing this exhibit, Bentley was

asked, "Are you still going to stand by your testimony that you texted him in January of 2014?"

and she responded, "No." (Doc. # 36-1, at 39, p. 57:1-4). After further questioning by

defendant's counsel, the following exchange took place between counsel and Bentley:

> Q.      Ma'am, I'm just simply following up on your testimony where you
> told me earlier on in this deposition . . . that you texted [Antunes] and
> specifically complained about gender discrimination.
> A.      Okay, I got it wrong with the text. It was January 2014. We're in
> 2017 now. How am I supposed to remember exactly what I did that day?
> Q.      Would you agree with me that nowhere . . . in these texts do you lodge
> complaint with Nuno about any type of gender discrimination - -
> A.      Yes, not in the texts.
> Q.      - - or sexist comments?
> A.      Not in the texts.

(*Id.* at 43, p. 62:6-20).

As previously noted, credibility determinations should generally not be made at the

summary judgment stage. Courts within the Second Circuit have applied the *Jeffreys* exception

to that general rule, however, in circumstances where the plaintiff relies almost exclusively on

her own testimony which is contradictory or incomplete and is contradicted by evidence

produced by the defense. *See Atkinson v. Huntington*, No. 9:15-CV-0065 (MAD/TWD), 2016

U.S. Dist. LEXIS 111705, at *24 (N.D.N.Y. Aug. 19, 2016).  Ambiguities or incompleteness are

not sufficient reasons to apply the *Jeffreys* exception. *See Paul v. Postgraduate Center for

Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015).  "[A] sham issue of fact exists only

when the contradictions . . . in . . . testimony are inescapable and unequivocal in nature." *In re

Fosamax Products Liability Litigation*, 707 F.3d 189, 194 (2d Cir. 2013).

8

The Court finds that this is one of those rare cases where "a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised *genuine* issues of material fact to be decided by a jury." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011). Bentley signed a written statement on August 14, 2014, in which she clearly stated that she had not reported Valentin's sexist comments, and in 2014 she also testified before the Unemployment Commission that she had not reported Valentin's conduct to her employer. Bentley's complaint to the Connecticut Commission on Human Rights and Opportunities, filed in February 2015, and her Complaint in this action both allege that Valentin made sexist comments to her in 2014, but both only allege that Bentley reported these comments to Antunes in September[2] 2014.

At her deposition, Bentley confirmed that she responded, "No" to the question posed by Antunes in August 2014, "Did you report these comments?" (Doc. # 36-1, at 10, p. 15:25, 11, p. 16:1-2). She then offered the following explanation of that response: "I didn't report it to my manager. I reported it to Nuno. So I wasn't sure what the question was exactly. Like, I didn't know if it was to him or to a manager." (*Id.* at 11, p. 16:5-8). She also acknowledged, however, that she never asked Antunes to clarify any of the questions he asked, and that at the end of the meeting she represented to Antunes that her statement was the complete truth.

Bentley then confirmed she had testified before the Unemployment Commission that she never reported Valentin's conduct to her employer. When asked if her testimony before the

---

[2]Although Bentley's references to September 2014 differ from the evidence that demonstrates she met with Antunes on August 14, 2014, the Court does not consider this to be a consequential difference.

9

Unemployment Commission was truthful, Bentley answered, "No." (*Id.* at 12, p. 17:13-14). The following exchange then took place between AutoZone's counsel and Bentley:

> Q.      Why did you lie to the unemployment office? . . . .
> A.      I didn't lie. I just - - you know, you're going through all these questions. You kind of lose what you're focusing on. You're sitting there for hours with Nuno and you're going through question after question after question with him and you're giving him as much detail as possible. Yeah, I didn't get to that part. I didn't remember what the question was; I didn't remember how it was said. So, yes, I did say no because I didn't know how he was asking it.

(*Id.* at 12, p. 17:20-25, 13, p. 18:1-5). Bentley's answer, which addressed her meeting with Antunes in August 2014, did not respond to the question why she had provided testimony that was not truthful to the Unemployment Commission.

At the beginning of her deposition, Bentley was asked how many times she had sent a text message to Antunes about sexist comments Valentin had made and her answer was, "I lost count after ten times. Because I would call, I would text, I would call, I would text, in that order." (*Id.* at 6, p. 11:21-23). After defendant's counsel showed Bentley copies of text messages she had sent to Antunes during the relevant time period, none of which made mention of any sexist comment by Valentin, she retracted her testimony that she had sent text messages to Antunes about sexist comments made by Valentin. Her explanation for this discrepancy was that it had been three years between the events in question and the time of her deposition and that while her text messages didn't contain complaints about gender discrimination, she made phone calls during this period in which she did make such complaints. Bentley also testified at her deposition that she had reviewed for accuracy both her complaint to the Connecticut Commission on Human Rights and Opportunities and her Complaint in this action before they were filed.

Bentley indicated to Antunes in August 2014 that in addition to Case, two other AutoZone employees had witnessed Valentin making sexist comments to her. Antunes subsequently interviewed both of these employees and both signed written statements in which they told Antunes that they never heard Valentin make derogatory or degrading comments about women. (Doc. # 36-4, at 12, 15).

"If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998). The Court finds that Bentley's attempts to explain the contradictions between her deposition testimony and both her August 2014 written statement to Antunes and her testimony before the Unemployment Commission are not plausible. Perhaps if it were only the written statement to Antunes that was at issue, her explanation, albeit a stretch, might be plausible, i.e., she wasn't certain whether Antunes' question referred to a report to a "manager" or to anyone, including Antunes himself. Her attempt to explain the contradiction between her deposition testimony and her testimony before the Unemployment Commission by referring to the same uncertainty about a question asked by Antunes, however, stretches plausibility beyond the breaking point.

Bentley's deposition testimony regarding pre-August 2014 complaints about sexist comments is directly contradicted by evidence produced by AutoZone. This evidence includes the deposition testimony of Campanile, the AutoZone handbook, text messages between Bentley and Antunes, Bentley's Connecticut Commission on Human Rights and Opportunities Affidavit, Bentley's August 2014 written statement to Antunes, an affidavit from Antunes with attached

signed statements from the two other AutoZone employees who, according to Bentley, had

witnessed Valentin making sexist comments to her, and Bentley's own inconsistent and

contradictory deposition testimony.

Bentley's deposition testimony that she had complained to Antunes, and to other

AutoZone managers, prior to August 2014 about sexist comments by Valentin "is so

contradictory and fanciful that it cannot be believed by a reasonable person" and, for that reason,

"it may be disregarded." *Jeffreys*, 275 F. Supp. 2d at 476.

### III.  FACTS

Bentley began working as a part-time sales employee at an AutoZone store in

Wallingford, Connecticut on April 15, 2013. Throughout her employment by AutoZone, Bentley

worked only at the Wallingford location.

At the beginning of her employment, Bentley received and read a copy of an AutoZone

employee handbook (the "handbook"). The handbook included a statement that "AutoZone does

not tolerate harassment of any nature." (Doc. # 36-1, at 84). It provided a list of actions that

could constitute sexual harassment, including "verbal abuse of a sexual nature" and "sexually

degrading words" and stated that any AutoZone employee who became aware of any harassment

of, or by, an AutoZone employee, was "required to report it immediately to management, Human

Resources or AutoZone Relations" at a listed  1-800 telephone number. *Id.*

The handbook included a Code of Conduct which prohibited employees from making

derogatory remarks about other AutoZone employees and specified that "AutoZone does not

tolerate . . . comments . . . that [are] . . . offensive or hostile." (Doc. # 36-2, at 39).  It also stated

that "[f]ailure to abide by the Code of Conduct is considered a serious violation and is

justification for corrective action up to and including immediate termination of employment."
(*Id.* at 38). Bentley was aware that the use of profanity at work could be grounds for termination.

AutoZone utilized a point system to track employee attendance issues. Employees who accumulated 12 or more points within a twelve month period were subject to termination. At his deposition, Campanile testified that AutoZone imposed progressive discipline for violations of the attendance policy. The progressive steps in this disciplinary process were "verbal, first written, second written, and serious violation." (Doc. # 45-5, at 12, p. 15:21-22).

Over the course of her AutoZone employment, Bentley was disciplined on several occasions for violations of the attendance policy. These included a "2nd Written Warning" issued in October 2013 and a "Serious Violation" issued in December 2013. (Doc. # 36-3, at 27, 28). As of March 7, 2014, Bentley had accumulated 11 points. On that date, she reported to work late, which added an additional 2 points for a total accumulation of 13 points. She was not terminated at that time, however, but was issued another "Serious Violation." (*Id.* at 26). Bentley knew in March 2014 that she was in danger of being terminated due to her poor attendance. In July 2014 Bentley was issued a third "Serious Violation" in connection with a violation of the attendance policy. (Doc. # 36-4, at 10).

Manny Valentin began working as a parts sales manager ("PSM") at the Wallingford AutoZone store on January 28, 2014. At that time the Wallingford store did not have a store manager, so District Manager Campanile was responsible for managing that store. Justine Case was the other PSM at the Wallingford AutoZone store. PSMs could assign work to other employees on a daily basis but did not have the authority to hire, fire, promote, demote, set compensation for, or schedule hours for other employees.

13

On May 21, 2014, Bentley sent a text message to Antunes in which she stated that Valentin had threatened to slap her. Although Bentley testified at her deposition that Valentin had made sexist remarks to her on the same occasion when he threatened to slap her, she also testified that she did not consider the statement about slapping to be gender-related and her text message to Antunes did not mention any gender-related remarks made by Valentin. On that same day, Bentley told Campanile that Valentin said he was going to slap her because she was not performing her job. During Bentley's tenure at AutoZone, PSM Justine Case also told her that she was not going to last long because she was not doing her job.

On July 25, 2014, Campanile advised Antunes that, according to PSM Case, Valentin and Bentley were not getting along. Antunes contacted Case on August 5, 2014, and she told Antunes that Valentin had made insulting and sexist remarks to Bentley. On August 14, 2014, Antunes interviewed Bentley and took her written statement. In her written statement, Bentley claimed that Valentin had made sexist comments to her, to Case, and to male customers about 15-20 times between January and July 2014. Although Bentley testified at her deposition that she had reported these sexist remarks to Antunes and other AutoZone managers beginning in January 2014, the Court has already determined that Bentley's testimony in that regard cannot be believed by a reasonable person and may be disregarded. Consequently, the Court finds that Bentley's statement to Antunes on August 14, 2014 was her first report of these sexist remarks.

That same day, August 14, 2014, Antunes instructed Campanile to try to avoid scheduling Valentin and Bentley to work together pending his investigation of the claims of sexist comments by Valentin. During the course of his investigation, Antunes interviewed Valentin, who informed Antunes that a couple of months prior to that time, Bentley had said to

him, "Manny you need to get your dick sucked." Based on that information, Antunes spoke again to Bentley and obtained another written statement from her. In that statement, dated September 10, 2014, Bentley admitted making the statement that Valentin had attributed to her and said this had occurred in February 2014.

After he completed his investigation, Antunes recommended to Regional Manager Charles Blank that both Bentley and Valentin be terminated for improper language. Based on Antunes' recommendation, Blank decided to terminate Bentley and Valentin and instructed Campanile to carry out the terminations. Bentley and Valentin were both terminated on September 17, 2014. Bentley was replaced by a female employee. Based on recommendations from Antunes, Blank had terminated other male employees for inappropriate comments and/or conduct.

## DISCUSSION

Bentley raises three claims under CFEPA: gender discrimination, hostile work environment, and retaliation. The Court will proceed to address each of these three claims.

### I. Gender Discrimination

CFEPA provides in part that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or an employer . . . to discharge from employment any individual . . . because of the individual's . . . sex . . . ." Conn. Gen. Stat. § 46a-60 (a)(1). Bentley claims that AutoZone violated CFEPA by terminating her employment on the basis of her gender.

"Claims arising under . . . CFEPA are analyzed under the familiar *McDonnell-Douglas* three-part burden shifting standard." *Grewcock v. Yale New Haven Health Services Corp.*, 293 F. Supp. 3d 272, 278-79 (D. Conn. 2017). Under the *McDonnell Douglas* framework, the plaintiff

carries the initial burden of establishing a prima facie case of discrimination by showing that:
"(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an
adverse employment action; and (4) the circumstances give rise to an inference of
discrimination." *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000). The
plaintiff's burden of establishing a prima facie case of discrimination is "*de minimis," Chambers
v. TRM Copy Centers Corp*., 43 F.3d 29, 40 (2d Cir. 1994).

   If the plaintiff can establish a prima facie case, a "presumption of unlawful discrimination
arises." *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996). The burden
of production then shifts to the defendant to "articulate a legitimate reason for the challenged
employment decision . . . ." *Id.* The defendant's burden "is one of production, not persuasion," and
"can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S.
133, 142, (2000) (internal quotation marks omitted). Moreover, the employer is not required to
persuade the Court that its conduct was motivated by its proffered reason. "[R]ather, it must simply
articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton
Hotel*, 143 F.3d 47, 52 (2d Cir.1998).

   If the defendant satisfies its burden of production, the plaintiff then carries the burden of
producing "sufficient evidence to support a rational finding that the legitimate, non-discriminatory
reasons proffered by the defendant were false, and that more likely than not discrimination was the
real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks and
alterations omitted). "[T]he evidence in plaintiff's favor, when viewed in the light most favorable
to the plaintiff [must be] sufficient to sustain a reasonable finding that [her] dismissal was

16

motivated at least in part by [gender] discrimination." *Adamczyk v. New York State Department of Correctional Services*, 474 F. App'x 23, 25 (2d Cir. 2012) (internal quotation marks omitted).

1. Plaintiff's Prima Facie Case Under the *McDonnell Douglas* Test

AutoZone does not dispute that Bentley satisfies the first three prongs of the prima facie case: she is a member of a protected class (female), was qualified for the position she held, and suffered an adverse employment action, termination. However, the parties dispute whether Bentley has established the fourth prong of a prima facie case of discrimination.

AutoZone argues that because Bentley was not replaced by someone outside her protected class and cannot establish that any similarly situated employee outside her protected class received more favorable treatment, she has failed to show that the circumstances of her termination give rise to an inference of discrimination. Bentley does not directly respond to these points. She argues instead that AutoZone permitted Valentin to harass her for months without taking any remedial action, and "[a]llowing Valentin to sexually harass plaintiff for months is evidence of discriminatory intent." (Doc. # 45-1, at 19).

The Court has already determined that Bentley's statement to Antunes on August 14, 2014 was her first report of sexist remarks by Valentin. Consequently, there is no factual support for Bentley's argument that AutoZone permitted Valentin to sexually harass her for months without taking any remedial action. Additionally, the Court does not agree with Bentley that Valentin's treatment of her from January to July 2014 gives rise to an inference that her termination in September 2014 was based on gender discrimination. Since Bentley's claim that she has satisfied the fourth prong of her prima facie case is based entirely on her contention that AutoZone allowed Valentin to harass her for a period of months without taking any remedial action, the Court

17

concludes that she has failed to satisfy that prong and thus has failed to establish a prima facie case under *McDonnell Douglas*.

Even if Bentley had been successful in establishing a prima facie case, her claim of gender discrimination would not survive AutoZone's motion for summary judgment. AutoZone clearly articulated a legitimate, non-discriminatory reason for her termination, i.e., her violation of the Code of Conduct in making a profane remark to Valentin. Bentley admitted making this profane comment to Valentin and was aware that the use of profanity at work could be grounds for termination.

There is no evidence before the Court that would support a finding that the legitimate reason articulated by AutoZone for Bentley's termination was a pretext for discrimination. In fact, as a result of Antunes' investigation, Regional Manager Blank decided to terminate both Bentley and Valentin for improper language. Additionally, based on recommendations from Antunes, Blank had terminated other male employees for inappropriate comments and/or conduct.

Bentley suggests that AutoZone's failure to follow a progressive discipline policy in addressing her violation of the Code of Conduct is evidence of pretext. As AutoZone points out in its reply memorandum, there is evidence in the record that AutoZone's progressive discipline policy applied to attendance issues, but no evidence that a progress discipline policy applied to violations of the Code of Conduct. Both Bentley and Valentin were terminated after Antunes' investigation for improper language in the workplace.  Even with regard to attendance issues, the evidence shows that while issuance of a "serious violation" was the last step in progressive discipline before termination, Bentley received three "serious violations" between December 2013 and July 2014 but was not terminated.

The Court concludes that AutoZone has shown that it is entitled to judgment as a matter of law as to Bentley's claim that her termination constituted gender discrimination in violation of CFEPA. Therefore, the Court grants AutoZone's motion for summary judgment as to that claim.

## II.  Hostile Work Environment

Bentley claims she was subjected to a hostile work environment in violation of CFEPA as a result of Valentin's gender-based harassment. AutoZone argues that Bentley cannot establish the requirements of a hostile work environment claim and cannot establish liability on the part of AutoZone.

A court considering a hostile work environment claim pursuant to CFEPA must "look to federal case law for guidance . . . ." *Brittell v. Department of Correction*, 247 Conn. 148, 164 (1998). A plaintiff seeking to establish a hostile work environment claim under federal law "must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). This standard has both an objective and a subjective component.  "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive. The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks and citations omitted).

AutoZone contends that Bentley has failed to establish that her work environment was either objectively or subjectively abusive. According to AutoZone, approximately 35 derogatory

remarks about women directed at Bentley by Valentin over a seven month period in 2014 were not sufficiently frequent or severe to create the required abusive working environment. AutoZone also argues that no physical threat was made in connection with any of Valentin's gender-based comments, and that Valentin's comments did not interfere with Bentley's work performance.

Bentley argues in response that Valentin repeatedly made sexist, derogatory remarks over a period of months. With regard to physical violence, Bentley contends that Valentin threatened to slap her right after making sexist remarks and that viewed in light of the totality of the circumstances, his threat can be considered to have been sex-based. Bentley also contends that Valentin's ongoing sexist comments made it stressful for her to go to work. She testified at her deposition that "I didn't know what he [Valentin] was going to do or say. So the moment I would go in [to work] I was on edge. . . . I just was stressed out the whole time." (Doc. # 45-7, at 17, p. 107:17-21). She also testified, however, that in spite of the stress she experienced, "I still did my job the right way. I still did everything the correct way." (*Id.* at 17, p. 107:19-20).

The factors a court must consider when determining whether the evidence supports a finding of a hostile or abusive work environment include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." *Harris*, 510 U.S. at 23. The Court does not believe that Valentin's remarks, in and of themselves, would satisfy the test for a hostile work environment. The Court agrees with Bentley, however, that Valentin's threat to slap her, when viewed in light of the totality of the circumstances, could be considered to have been sex-based.

20

According to Bentley, Valentin had been making sexist remarks to her, and in front of her, since he began working at the Wallingford store, and his threat was made immediately after he made such sexist remarks. While the Court previously found that Bentley did not report any of these sexist remarks until August 2014, the Court has not found that Valentin did not make these remarks. Given what could be considered a sex-based threat of physical harm, as well as the effect the threat and many remarks had on Bentley's psychological well-being, the Court, for purposes of ruling on AutoZone's motion, accepts that Bentley has demonstrated an abusive working environment.

AutoZone also argues that Bentley has failed to establish a basis for holding it liable for Valentin's sex-related comments or actions. Bentley responds that because Valentin was her supervisor, and because AutoZone was on notice of Valentin's harassment, AutoZone is liable for Valentin's sexual harassment.

An employer will be liable for the creation of a hostile work environment "when the harassing employee is plaintiff's supervisor." *Savage v. Southern Connecticut State University*, No. 3:09-cv-00302 (JAM), 2016 U.S. Dist. LEXIS 27815, at *18 (D. Conn. March 3, 2016) (citing *Vance v. Ball State University*, 570 U.S. 421, 428 (2013)). In the context of a hostile work environment claim under Title VII (42 U.S.C. § 2000e-2 (a)(1)), an employee will be considered a supervisor "only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S. at 431 (internal quotation marks omitted).

21

Valentin would not be considered Bentley's supervisor under the *Vance* standard. While he did have the authority to assign work to Bentley and apparently had some authority to verbally discipline her, he was not empowered to "effect a significant change in [her] employment status." *Id.* Although Bentley does not concede this point, she also suggests that the Court should interpret the term "supervisor" under CFEPA more broadly than the Supreme Court has defined it under Title VII in order to "effectuate the remedial nature of CFEPA." (Doc. # 45-1, at 11). The Court notes that Title VII has also been characterized as "remedial" in nature. *See Palmer v. General Mills, Inc.*, 513 F.2d 1040, 1043 (6th Cir. 1975) ("The thrust of Title VII is not punitive but remedial."). The Court also recognizes that while there are slight differences between the language in Title VII and the language in CFEPA, "it is clear that the intent of the legislature . . . was to make the Connecticut statute coextensive with the federal [statute]." *Brittell*, 247 Conn. at 164. Bentley does not cite any case dealing with the term "supervisor" under CFEPA or to any other legal authority that addresses this point and the Court declines her invitation to find that Valentin was her supervisor for the purpose of her hostile work environment claim under CFEPA.

An employer may also be liable for the creation of a hostile work environment by one of its employees "if the employer was negligent with respect to the offensive behavior." *Vance*, 570 U.S. at 427. An employer's liability for a hostile work environment created by a nonsupervisory employee "depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004).

Bentley argues that even if Valentin was not a supervisor for the purpose of a hostile work environment claim, AutoZone is liable for Valentin's harassment. Her argument is based on her

contention that she "notified her employer of Valentin's harassment on multiple occasions. Despite her complaints, the harassment continued." (Doc. # 45-1, at 12).

The Court has already found that the first time Bentley reported sexist remarks by Valentin, and consequently the first time AutoZone was put on notice of her allegations of sexist remarks, was on August 14, 2014, when she was interviewed by Antunes. On that same day, Antunes instructed Campanile to try to avoid scheduling Valentin and Bentley to work together pending his investigation of the claims of sexist comments by Valentin. At the conclusion of his investigation, Antunes recommended that Valentin be terminated and Regional Manager Blank acted on that recommendation and made the decision to terminate Valentin. These facts do not support a finding that AutoZone knew, or should have known, about the harassment but failed to take appropriate remedial action.

Because Bentley has failed to establish a basis to impute liability to AutoZone, her hostile work environment claim against AutoZone fails and AutoZone's motion for summary judgment is granted as to that claim.

### III.  Retaliation

Bentley also claims that AutoZone violated CFEPA by terminating her employment in retaliation for having complained about being sexually harassed by Valentin. AutoZone argues that Bentley's retaliation claim fails because she cannot establish a causal connection between her complaint of sexual harassment and her termination.

CFFEPA prohibits employers from discharging an employee because that employee "has opposed any discriminatory employment practice . . . ." Conn. Gen. Stat. § 46a-60 (a)(4). "The

intent of the Connecticut legislature in adopting the CFEPA was to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case law for guidance in interpreting this provision of the CFEPA." *John v. Bridgeport Board of Education*, Civ. Action No. 09-cv-378 (VLB), 2011 U.S. Dist. LEXIS 29154, *50 (D. Conn. March 22, 2011). Retaliation claims under Title VII are analyzed under the *McDonnell Douglas* standard. *Id* at 49.

    "To establish a *prima facie* case of unlawful retaliation under Title VII, an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Mills v. Southern Connecticut State University*, 519 F. App'x 73, 76 (2d Cir. 2013) (internal quotation marks and alteration omitted). There is no dispute that Bentley has established the first three prongs of her prima facie case of retaliation. Her report to Antunes on August 4, 2014 that she had been sexually harassed by Valentin was protected activity of which her employer was aware. Although Bentley now alleges ongoing reports of sexual harassment beginning in January 2014, the Court has previously found that her statement to Antunes on August 14, 2014 was her first report of sexual harassment. It is also clear that Bentley also suffered a material adverse action when her employment was terminated.

    Temporal proximity between the protected activity and the materially adverse action can give rise to an inference of retaliation for the purpose of establishing a prima facie case of retaliation under Title VII. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010) ("By demonstrating temporal proximity between his complaint and his discharge, El Sayed arguably established a prima facie case of retaliation under Title VII."). Here, Bentley was

terminated approximately one month after she reported Valentin's sexual harassment to Antunes. Keeping in mind that a plaintiff's burden in establishing a prima facie case under *McDonnell Douglas* is minimal, the Court finds that the temporal proximity between Bentley's August 14, 2014 report of sexual harassment and her termination on September 17, 2014 is sufficient to establish a prima face case of retaliation.

Since Bentley has established a prima facie case of retaliation, the burden shifts to AutoZone to articulate a legitimate, non-retaliatory reason for her termination. The reason given by AutoZone for Bentley's termination was her use of profane language in speaking to Valentin, language which she acknowledged using and which was a violation of the AutoZone Code of Conduct. AutoZone has met its burden of production through the articulation of this reason for Bentley's termination. The burden thus shifts back to Bentley to come forward with evidence that would support a finding that the reason articulated by AutoZone was a pretext for illegal retaliation. Although temporal proximity may give rise to an inference of retaliation at the prima facie stage, "without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext." *El Sayed*, 627 F.3d at 933.

Besides temporal proximity, Bentley points to AutoZone's failure to follow its progressive discipline policy in response to her profane remark as evidence of pretext. The evidence before the Court indicates that AutoZone utilized a progressive discipline policy with respect to violations of the company's attendance policies. In that regard, it appears that prior to September 18, 2014, Bentley had already been through all of the attendance-related steps of progressive discipline and had received additional "Serious Violation" notices in lieu of termination.

The evidence does not support a finding that a progressive discipline policy applied to violations of the AutoZone Code of Conduct. The AutoZone handbook expressly provided that "[f]ailure to abide by the Code of Conduct is considered a serious violation and is justification for corrective action up to and including immediate termination of employment." (Doc. #36-2, at 38). Bentley acknowledged at her deposition that she had made a profane remark to Valentin and that the use of profanity at work was grounds for termination.

As a result of Bentley's report to Antunes about Valentin's sexist remarks, Valentin also was terminated for a violation of the Code of Conduct, i.e., use of improper language in the workplace. Regional Manager Blank, who made the decision to terminate both Bentley and Valentin, had terminated other male employees for inappropriate comments and/or conduct. There is no indication that any type of progressive discipline was utilized in connection with any of these terminations for violations of the Code of Conduct.

The Court finds that Bentley has failed to produce any evidence beyond temporal proximity that would support a finding of pretext and thus has failed to satisfy her ultimate burden of "establishing that it is more likely than not that the employer's decision [to terminate her employment] was motivated . . . by an intent to retaliate against [her]." *El Sayed*, 627 F.3d at 933. For that reason, AutoZone's motion for summary judgment is granted as to Bentley's retaliation claim.

CONCLUSION

For the reasons stated above, the defendant AutoZone's motion for summary judgment

(**doc. # 36**) is **GRANTED**.

Judgment shall enter in favor of the defendants AutoZoners, LLC and AutoZone Northeast,

LLC, and the Clerk is directed to close the file.

SO ORDERED this   18th        day of July, 2018.

_____/s/  DJS_____
                 Dominic J. Squatrito
                United States District Judge